Daniel P. Winikka (State Bar No. 00794873)
**WINIKKA LAW PLLC**
7522 Campbell Road, Suite 113, #419
Dallas, TX 75248
Phone: 469-384-7710
Facsimile 469-384-7709
dan@danwinlaw.com

PROPOSED COUNSEL FOR DEBTOR IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **MATTHEW B. MARTORELLO,** | § | **Case No. 24-90016-mxm-11** |
| | § | |
| | § | |
| **Debtor.** | § | |
| | § | |

### DEBTOR'S STATEMENT REGARDING COMMENCEMENT OF CHAPTER 11 CASE

Matthew B. Martorello ("Matt"), the above-captioned debtor in possession, files this Statement Regarding Commencement of Chapter 11 Case to provide the Court and parties in interest a factual background to put in context (i) the need for relief and a fresh start and (ii) issues that will or may need to be addressed by the Court in this proceeding. As explained below, Matt is an "affiliate" of Eventide Credit Acquisitions, LLC ("Eventide"), a debtor in possession in this Court (Case No. 23-90007-mxm-11), because he indirectly owns or controls more than 20% of its voting member interests. Matt did everything under his power to avoid the need for bankruptcy relief, but for the reasons as explained below, the commencement of this case ultimately became the best, and perhaps only, way for Matt to obtain closure and a fresh start for himself and his family.

### *Overview of Need for Bankruptcy Relief*

1.      Along with Eventide, Matt is a defendant in lawsuits filed in at least three

different states on behalf of consumers who obtained loans from an arm of a federally recognized

Indian tribe, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD" or the

"Tribe").  For the same reasons articulated in Eventide's statement of position (Docket 15 in

Eventide case), Matt disputes that any of these plaintiffs have valid claims.  This is particularly

so because he consulted with the country's most prominent attorneys in Federal Indian law who

established the entire arrangement between LVD and entities that Matt controlled and that would

provide services to assist LVD's lending business, as well as the LVD lending code and the

borrower facing disclosures, documents and contracts, and then repeatedly (and correctly) opined

on the legality of LVD's loans.  Their opinion regarding the legality of LVD's loans was

conveyed to Matt, asserted in dozens of letters to various regulators who contested the

application of tribal law, and the legal predicate of the opinion was openly published in

nationwide publications and reports to federal agencies and lawmakers.  (*Id.* at Exhibit A).  The

loans were legal, and Matt had a good faith belief that the loans, and the conduct of his entities,

were legal.

2.      As explained below, however, on June 8, 2023, the federal district court in

Virginia ruled that Virginia law applies to LVD's loans.[1]   The Virginia district court further

ruled on June 16, 2023, that (i) "persons engaged in the enterprise collected unlawful debts"; (ii)

"there is no willfulness element for a civil cause of action under 18 U.S.C. §§ 1962 (c) – (d)"

[part of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968

---

[1] The determination of applicable law had nothing to do with Matt, nor his role with the Tribe, facts
which remained highly disputed but irrelevant.

("RICO")];[2] and (iii) a good faith defense is not available under RICO and Matt need not know of the loans' illegality to establish a RICO violation. Finally, on June 26, 2023, the Virginia court ruled that liability does not require proof that the defendant controlled the enterprise.

3.      On June 30, 2023, reserving all rights to appeal those rulings, which Matt believes are erroneous, and to avoid a wasteful trial and obtain appellate review as quickly as possible, Matt stipulated that according to the Virginia court's rulings at that time, he is liable for the entire class period because he was "associated with an association-in-fact enterprise." On July 10, 2023, Matt and the plaintiffs stipulated that the judgment in that case equated to the trebling of all interest that LVD had ever collected in interest payments from Virginia borrowers during the class period, *less* Virginia's unlicensed usury cap of 12%, which amounted to $43 million.[3]

4.      Matt appealed the judgment to the Fourth Circuit Court of Appeals in September 2023. Matt's source of income to continue to defend himself, however, was cut off in September 2023 when the Tribe stopping making payments it owed to Eventide.

5.      By early 2024, it became evident that Matt could not continue to defend himself in multiple jurisdictions and hold everything at bay until the Fourth Circuit ruled. Accordingly, even though he strongly believed that he would prevail in his appeal, he began discussions with class counsel regarding a possible settlement that would (a) include not just the borrowers in Virginia, which constituted only about 3% of LVD's borrowers nationwide, but all the Tribe's borrowers nationwide through May 1, 2024; and (b) help him avoid a personal bankruptcy filing.

6.      To that end, after months of negotiations earlier this year, Matt agreed to a

---

[2] On August 15, 2023, the Virginia court entered a new order stating that its ruling that "'[t]here is no willfulness element for a civil cause of action under 18 U.S.C. §§ 1962(c)- (d)' is overly broad and thus is erroneous" and vacated the order for a new order that omitted that holding.

[3] As for liability for any potential state usury claims, those laws simply do not extend to officers of vendors or financiers of a lender.

contingent, global class settlement (the "Global Settlement") relating to his potential liability to

consumers nationwide that obtained loans from the Tribe through May 1, 2024.  The Global

Settlement, if consummated, would resolve (i) Matt's potential liability to a nationwide class of

consumer borrowers through that date and (ii) vacate the existing $43 million judgment owed to

a discrete group of Virginia borrowers through December 20, 2019, which is currently on appeal.

The Global Settlement would also resolve Eventide's potential liability to the same nationwide

class of borrowers.

7.     The Global Settlement is conditioned upon the ability to sell up to 50% of certain

shares in a private company at the plaintiffs' required price by the plaintiff's required deadline

(October 21, 2024).  An investment bank has been running a marketing process for the sale of

those shares.  A Texas trust and LLC owns the equity to potentially be sold.  Matt does not

control that trust nor is he a beneficiary, but Matt is owed approximately $23 million from his

sale of those shares in 2018, pursuant to two promissory notes.  Predicated only upon Matt's

commitment to fund the trust with all his assets, the trustee agreed to sell the equity to fund the

Global Settlement if the proceeds meet the plaintiffs' requirements.  Matt's commitment would

primarily include the two promissory notes and recoveries Matt receives from Eventide (pursuant

to his indemnification rights or otherwise).[4]

8.     The commencement of this case nonetheless became necessary, however, for

three primary reasons:  (i) unresolved issues with the Internal Revenue Service ("IRS") over $8.5

---

[4] As of this date, the company running that sale process has indicated that (i) all best and final offers are
due in the next two weeks and (ii) assuming one or more satisfactory offers, a transaction could be
consummated either by the deadline in the settlement or very soon thereafter, depending on final diligence
requirements of the buyer and any necessary regulatory approval.  Unfortunately, only two weeks before
the bids come in for up to 50% of the shares, the plaintiffs attempted to re-trade the deal expressing their
position that the settlement be terminated unless the trustee agrees to increase the maximum percentage of
shares to be sold to satisfy the settlement from 50% to 100%.  Matt remains committed to the agreed upon
terms and is hopeful that the 50% interest will net the agreed settlement amount.

million in erroneous tax penalties; (ii) the recent filing of a frivolous lawsuit against Matt and

Eventide's attorneys in tribal court; and (iii) to ensure his fresh start, through possible findings or

other actions, including addressing any potential liability that Matt could have for the Tribe's

continuing lending after the May 1, 2024 end date of the settlement class.

9.      Regarding the IRS penalties, during the past couple of years, Matt has been

working diligently to try to resolve millions of dollars of erroneous tax penalties relating to

annual information returns for a foreign trust that was established in 2013.  Because the foreign

trust is not controlled by any U.S. person, Matt is deemed the "tax owner" for U.S. tax purposes.

Matt, however, did not settle the trust, has never made any contribution to the trust, nor does he

have any authority or rights to the trust given that he is not a beneficiary of the trust, is not its

trustee (which is an international duly licensed trust management company), is not its protector

(which is also an international licensed trust management company) and has never been

mentioned whatsoever in the trust agreement.[5]

10.      As explained below, the annual information returns for the trust were indeed

timely filed and no income or assets were ever unreported, underreported, or untimely reported.

If they were not timely filed, such would be solely the result of Matt's CPA's chosen

methodology as to "how" a CPA should report the information each year, not any failure to

report the information.  The CPA who compiled and directed the filing of those forms has

provided a sworn declaration in support of Matt's reasonable cause statement to the IRS

discussing the CPA's basis for his reporting methodology, which is cause for full abatement of

---

[5] Despite this complete lack of any authority or rights, plaintiffs in Virginia asserted that assets in this irrevocable spendthrift discretionary trust, and assets of any other trusts or entities on Matt or his wife's returns, are nonetheless *legally* owned or "de facto" controlled by Matt and are somehow available to pay Matt's creditors.  While assets of such trusts and entities are not property of Matt's estate or under his control, if necessary, this Court can resolve any dispute over those issues.

the penalties.

11.     For over a year now, Matt has been unable to obtain the necessary IRS review of

his dispute over the penalties, which currently aggregate over $8.5 million.  The IRS collection

arm, however, continued to press forward notwithstanding that Matt's contest of the penalties

had not been heard at an appeals conference.  On July 19, 2024, Matt received a "Final Notice of

Intent to Levy."

12.     At that point, it became evident that the inability to resolve the tax penalties

expeditiously could have significant adverse consequences, including the IRS obtaining a lien on

the assets Matt committed to the Texas trustee in order to facilitate the Global Settlement, putting

the IRS in front of his other creditors and potentially resulting in the inability to discharge the

penalties if they were ultimately determined to stand.  The IRS could also thereafter take

enforcement actions to seize Matt's assets.  The inability to timely resolve these pending tax

penalties (which should be abated in full as explained below) could jeopardize Matt's ability to

fulfill commitments he made to support to the Global Settlement.

13.     The commencement of this case will give Matt the opportunity to seek an

expeditious resolution of these tax penalties through section 505 of the Bankruptcy Code and

preserve the possibility for the Global Settlement to be consummated.  Matt expects to file a

motion for determination of these tax penalties under section 505 at the outset of his chapter 11

case.

14.     In addition to the need to expeditiously address the IRS erroneous penalties, on

August 28, 2024, in disregard of this Court's jurisdiction over pending disputes between

Eventide and the Tribe's lending arm—Big Picture Loans, LLC ("Big Picture")—as well as the

forum waiver Eventide had negotiated with Big Picture, Big Picture filed a lawsuit in tribal court

(the "Tribal Court Lawsuit") asserting frivolous claims against Matt, two law firms as Eventide's

prepetition counsel and the lawyers in their individual capacities as well, alleging that a Notice of

Default and Supplement to the Notice of Default sent on behalf of Eventide to Big Picture prior

to Eventide's bankruptcy filing constituted fraud against Big Picture. Notably, the only alleged

representations in the Tribal Court Lawsuit that purportedly give rise to the fraud claims asserted

are the statements made in those two notices that were sent on behalf of Eventide – notices that

Big Picture's counsel vigorously disputed in numerous written correspondence with Eventide's

counsel.

15.     Matt believes that the lawsuit was pure gamesmanship to avoid having Big

Picture's defenses to non-payment litigated in this Court or arbitration. Indeed, Big Picture's

counsel informed this Court that the reason Big Picture proclaimed a *force majeure* and did not

pay was because of the two Eventide notices, which Big Picture asserted in this Court were a

violation of Eventide's duty of good faith and fair dealing. The Tribal Court Lawsuit is a blatant

attempt to shift the adjudication of Big Picture's defense to payment default into the hands of the

Tribe's own court.[6]

16.     If the Tribal Court Lawsuit proceeds, Matt would be required to fund his own

defense given that Eventide cannot at this point advance defense costs. More important, any

claim related to those Eventide notices to Big Picture should be adjudicated in this Court in any

event. If either notice gave rise to any claim of Big Picture, it would per se give rise to a claim

against Eventide, the lender that sent the notices to its borrower.

---

[6] The Tribe also filed a complaint in tribal court seeking to exercise condemnation over the Eventide note and loan and security agreement and proposing to compensate Eventide with a 3-year note of inconsequential value, further diminishing commitments Matt made to support the Global Settlement. Matt contends that the condemnation resolutions, which were passed shortly before the complaint was filed, constitute defamation because they include knowingly false public statements plainly disproven by numerous statements and testimony given under oath by various tribal officials.

17.     Matt as well as the other defendants in the Tribal Court Lawsuit – certain lawyers and their law firms that were prepetition counsel to Eventide – were acting solely on behalf of Eventide.  If Matt is determined to have any liability for Eventide having sent the notices, it would also establish liability of Eventide.  Eventide is plainly the real party defendant.  In fact, the claims would additionally be compulsory counterclaims in the currently pending adversary proceeding Eventide filed against Big Picture to collect payments on the note that is the subject of the notices that purportedly constituted fraud.

18.     The commencement of this case will not only stay prosecution of those claims against Matt, but also help ensure that those claims are addressed by this Court in coordination with the administration of Eventide's estate.

19.     In addition, when the Global Settlement is hopefully consummated, there may nonetheless be a need for additional closure with respect to any potential liability Matt could have for the Tribe's continued lending after the May 1, 2024 end date of the settlement class.  Even though Matt has not been involved in the Tribe's lending since he sold them his company in 2016, he and other vendors or creditors of Big Picture could still be sued for *three times* Big Picture's revenues (less unlicensed state usury caps) under the theories asserted in the existing cases.  In fact, Eventide, as the recipient of note payments from Big Picture in the first instance, faces the same potential issue of perpetual liability arising solely from receipt of note payments from Big Picture.  To the extent necessary to achieve his fresh start, this bankruptcy case will give Matt the opportunity to seek a ruling relating to the Tribe's ongoing lending, or if necessary, prospective injunctive relief pursuant to the *Ex Parte Young* doctrine to ensure the Tribe will not engage in any future violations of federal law for which Matt could be held liable.  This will ensure he, and others, do not have perpetual liability exposure relating to the Tribe's ongoing

lending activities.

20.     Furthermore, if the Global Settlement cannot be consummated, this chapter 11 case will provide a centralized forum to determine, alongside Eventide and BWH Texas, LLC, whether Matt has any liability to (i) consumer borrowers *nationwide* other than the June 22, 2013 – December 20, 2019 Virginia borrowers included in the $43 million judgment and (ii) consumer borrowers in Virginia if the judgment is vacated and the lawsuit is not dismissed on appeal.  The issues associated with determination of whether Matt has any such liability are largely, if not entirely, the same as the issues that would be litigated in respect of the consumer borrower claims against Eventide.  While Matt expects to remain solvent through the conclusion of this bankruptcy, if Matt is ultimately determined to have liability, this chapter 11 case will likewise provide a level playing field, and ensure ratable treatment, for his bona fide creditors.

### *Matt's Background and Entrepreneurial Endeavors*

21.     Matt is a finance and accounting major from the University of Illinois, and an alumnus of Columbia Business School's Venture Capital and Private Equity program.  Matt began his career as an investment banker in institutional corporate bonds at Salomon Smith Barney, moved into trading, and then worked in KPMG's Transaction Services Group.  Through his work at KPMG in 2008 and 2009, Matt developed subject matter expertise in the online short-term lending industry, and in turn set out to build an online lending business.

22.     Matt initially launched a lending business in 2009 for an investor.  Shortly after, he launched other lending businesses, as minority owner or jointly owned with other investors.  As "fintech" became prominent, his work evolved into servicing lenders.  In 2013, Matt founded a fintech company called Braviant, which achieved high acclaim from Entrepreneur, Deloitte's Fast 500, American Banker, and others.

23.     Over the years, Matt would operate a family office, which launched entities in technology, asset leasing, voice transcription (used today in 911 call centers, international banks and on police body cameras nationwide), trading, maritime credit and later operations and management or service entities related to the foregoing entities.

24.     Initially, and throughout his ventures, Matt hired well-qualified attorneys to advise him.  After his early successes, Matt engaged counsel for long-term estate planning purposes.  On November 1, 2010, Matt, through his counsel, and Guardian Trust Corporation as trustee, settled a Cook Islands irrevocable spendthrift discretionary trust (the "Bluetech Trust" or "2010 Trust").  Guardian Trust Corporation was a subsidiary of a large and reputable international trust management company, duly licensed in the Cook Islands.  Matt's mother and siblings were the beneficiaries.  In 2013, the Guardian Trust Corporation settled a Nevis irrevocable discretionary spendthrift trust (the "Capstone Trust" or "2013 Trust").  Bluetech was the sole beneficiary of the Capstone Trust and the trustee for the Capstone Trust was Asiatrust Nevis Limited.

25.     Matt is currently employed part-time as "Director of Business of Development" for Braviant, where he receives a small salary.  Matt's primary employment is as Manager for Eventide, though his salary has been accruing and unpaid for the last one year.  Eventide is owned 59.6% by BWH Texas, LLC, 25.5% by Gallant Capital, LLC (wholly owned by Matt), 9.9% by Justin Martorello (Matt's brother), and 5% by a nationwide class of consumer who borrowed from the Tribe's lending arm (Big Picture), via certain individuals.  BWH Texas, LLC is indirectly, and equally, owned by Matt's three children and is also a debtor in possession in this Court (Case No. 23-43085-mxm-11).

26.     To better understand the need for the legal entities that were formed over time as well as the complex structure affiliated with his tax returns and tax filing requirements (as well as the IRS penalties primarily driving the need for the commencement of this case) it is helpful to understand Matt's residential and economic tax grant history.

### *Matt's Participation in Tax Grant Programs in the US Virgin Islands and Puerto Rico*

27.     Matt's estate planning began in 2009, whereby he was advised to ultimately own business interests in a Delaware irrevocable life insurance trust and LLC for any portion that he wished to attribute to a long-term generational estate plan.  When that proved too expensive to sustain, he was advised in 2010 to establish Bluetech.  Bluetech would later invest certain of its assets in private companies that Matt would manage and in which Matt would have a 30% economic interest and Bluetech through subsidiaries a 70% interest.  Matt has not made any contributions to Bluetech since 2013.

28.     After a successful few years in Chicago, Illinois, in July 2011, Matt moved to the US Virgin Islands ("USVI") to participate in its economic development program (https://usvieda.org/).  The program offered a 90% exemption in operating income tax for USVI sourced income, but no exemptions for US sourced income or for capital gains.  While some business remained in Chicago, in advance of his relocation, Matt formed Bellicose VI, Inc. to be the holding company that received the USVI government decree, which provided for a broad scope as to the various business activities it would perform under the exemption and the requirements with which it needed to (and did) achieve.   Bellicose was for the most part a technology and database company and would monetize its capabilities through various subsidiaries. Bellicose VI, Inc. later became Bellicose VI, LLC (for tax purposes).  One such

subsidiary of Bellicose, SourcePoint VI ("SPVI"), was also formed in 2011 to provide data

driven advisory services to multiple online lending clients, including to LVD.

28.     Matt married his wife Rebecca in 2012 while living in the USVI.  While keeping

some business operating in the USVI, Matt and Rebecca subsequently moved to Puerto Rico on

January 1, 2014 to participate in similar economic development program there

(https://torrescpa.com/pr-tax-incentives/act-20/).  The key difference was that Puerto Rico

additionally offered a 100% exemption on capital gains.  The relocation and receipt of that tax

decree would call for a new holding company and grantee to be formed, a Delaware LLC called

Bellicose Capital, LLC.  Matt additionally owned a call center in the Philippines, which also

necessitated structuring considerations.  After the 2014 relocation, some operations would source

revenues in the USVIs, others stateside, and others would be sourced in Puerto Rico where the

Martorellos lived and where Bellicose and Matt established corporate offices.

29.     After Rebecca gave birth to their first son in Puerto Rico in August 2015, the two

considered moving back stateside.  And after their second son was born in May 2017, they

relocated to Dallas, Texas, where they have resided ever since.   With many different business

operations and investments operating in multiple jurisdictions and internationally, including

companies with various tax decrees and operating subsidiaries, as well asa split between Matt's

personal estate and Bluetech as his generational estate plan, the separation of income sourcing

and ownership would always be a fundamental consideration in the legal structures and their

various businesses or investments.

### *Litigation Arising Over Tribal Lending*

30.     In 2011, Matt became aware of an opportunity for Bellicose to service the Tribe,

which had been exploring online lending as a means of generating needed revenues for the Tribe.

On July 8, 2011, the LVD Tribal Council passed resolutions to enact their first lending code for online automobile title lending.[7] In September 2011, LVD formed Red Rock Tribal Lending, LLC ("RRTL"), a wholly-owned arm of the Tribe, with all of its operations on the reservation, and in compliance with all Federal laws.

31.     Matt engaged Jennifer Weddle, of Greenberg Traurig ("GT"), one of the most prominent Indian law lawyers in the country, to structure the relationship with the Tribe to ensure that both the tribal loans and the relationships between his companies and LVD were entirely lawful. After examining the appliable law and investigating all aspects of the LVD lending business, GT structured the transaction and the operational elements, based on its determination that the arrangement between, and the conduct of, Bellicose and LVD would be perfectly legal.

32.     A servicing agreement between RRTL and SPVI (the "Servicing Agreement") was created by GT and Rosette LLP (the Tribe's lawyers), modeled after the National Indian Gaming Commission management template. Under the Servicing Agreement, in payment for the services SPVI provided, RRTL would first issue the Tribe a guaranteed monthly dividend, then it would pay all RRTL's expenses, and if anything was left, SPVI would be paid a performance-based fee based on the net profitability of RRTL.  Under the Servicing Agreement, RRTL could fire SPVI with 180 days' notice.

33.     In 2012, LVD council woman Hazen and their attorney Wicthman approached Matt seeking to purchase SPVI.  As a result, LVD and Matt began discussing the potential sale of SPVI to the Tribe on and off over several years.  When Rebecca reached the end of her first

---

[7] Matt was not involved in LVD's inception into online lending, as its online title lending business was launched prior to Matt's company servicing with respect to their unsecured small dollar lending objectives.

trimester with their first son, discussions to sell the business became more serious and multiple tribes expressed interest in buying SPVI.  Matt and Rebecca's first child was born in Puerto Rico in August 2015, and they were considering a relocation stateside.  Accomplishing a sale before any move back to the states would allow Matt to benefit from the Puerto Rico capital gains tax exemption under his decree, which is what compelled Matt to relocate there.  This became a primary motivation for the possible sale.

34.    Ultimately, Matt retained John Williams, an adjunct professor of Indian law and Indian law attorney at Conner and Winters, LLP to facilitate a sale. In connection the anticipated sale, they formed Eventide Credit Acquisitions, LLC (Eventide), and Eventide acquired ownership of Bellicose, which, in turn, owned SPVI.  Eventide then sold Bellicose to the Tribe on January 26, 2016, in a seller-financed transaction.

35.    In connection with the 2016 sale, LVD created Big Picture Loans, LLC as the tribal lending entity, Ascension Technologies, LLC ("Ascension"), as the servicing entity, and a holding company Tribal Economic Development, LLC to hold the ownership of Big Picture and Ascension.

36.    In exchange for conveying the Bellicose equity to the Tribe, Eventide received a variable payment note that terminated at the earlier of seven years or a maximum of payments totaling $300 million (the "Original Note").  The Bellicose sale was valued for taxation purposes at $108 million. The Tribe's counsel, Rosette, LLP, provided Eventide with a legal opinion regarding the enforceability and legality of the financing and underlying consumer lending. This seller financed model was designed by the Rosette law firm and used by several other tribal lending enterprises both before and after Eventide's seller-financed transaction with LVD. Rosette law also provided the multiple by which to value the sale and the initial term sheet.

14

37.    On January 26, 2016, Ascension obtained the old assets and personnel of Bellicose/SPVI and supported Big Picture as a wholly owned and operated arm of the Tribe. Since the 2016 sale, Matt's only connection to the Tribe's lending operations has been via Eventide.  After disputes arose between Big Picture and Eventide in 2019, Eventide wrote down the value of the Tribe's obligation by more than $50 million through a settlement that was executed in August 2020.   Since September 18, 2020, Eventide has only received settlement payments pursuant to that settlement with the Tribe.  Due to the burden associated with the litigation discussed below and reduction of payments to Eventide from the 2020 settlement, Eventide has not issued equity distributions to its owners since November 2019.

38.    In 2017, a statewide class action lawsuit (the "*Williams*" lawsuit) was commenced against Matt and Big Picture in the Eastern District of Virginia for alleged violation of the Virginia usury laws, unjust enrichment, and "collection of unlawful debt" under RICO.  Similar class action lawsuits were later commenced in several other states.

39.    After an adverse ruling in the Virginia district court that Big Picture and Ascension were not arms of the Tribe, LVD appealed to the Fourth Circuit.  On the same facts, the Fourth Circuit overturned the lower court's ruling, rejecting the plaintiffs' "rent-a-tribe" argument that the tribal entities were formed for the real purpose of allowing Matt to avoid liability, rather than help the Tribe start a business; and concluding that Big Picture and Ascension are arms of the Tribe that "serve the [federal policy] purposes of tribal economic development and self-governance."  The Fourth Circuit ordered that Big Picture and Ascension be dismissed from the lawsuit.

40.    The district court, however, did not dismiss Big Picture and Ascension, and after several months, Big Picture and Ascension entered into settlement negotiations and reached a

class-wide settlement that the district court thereafter approved.  Notably, pursuant to that

settlement, the class plaintiffs were given 5% financial interests in Eventide, and were paid $8.7

million over two years, from Big Picture's continuation of what the class plaintiffs still allege to

be racketeering conduct.  After approval of that settlement, Big Picture and Ascension were

finally dismissed.  The dismissal left Matt as the sole defendant in the *Williams* lawsuit, arguing

important federal Indian law and policy issues, without any ability to compel tribal witnesses,

due to their tribal immunity.

41.    The parties thereafter conducted discovery and filed motions for summary

judgment.  Plaintiffs focused on their RICO claims and asserted that (i) the loans are governed

by Virginia law and usurious and thus "unlawful debt" under RICO; (ii) participants in the Tribal

lending operation – including Matt, Eventide, the Tribe, Big Picture and Ascension – constitute a

RICO enterprise; and (3) persons associated with the enterprise collected, and conspired to

collect, "unlawful debt" in violation of RICO.  Plaintiffs also asserted that Matt was liable under

RICO regardless of whether he believed the loans were governed by Tribal law and thus lawful.[8]

42.    Matt contended Tribal law governed the loans and he believed in good faith that

the loans were lawful and thus lacked the required scienter to violate RICO.  Matt waived his

attorney client privilege with GT to prove his defense.  As such, Ms. Jennifer Weddle, co-head of

Federal Indian law at Greenberg Traurig ("GT"), was deposed twice and testified that, consistent

---

[8] In a tactic to increase pressure on Matt, Rebecca Martorello was improperly sued for civil RICO in 2019 as well.  Though the suit against her remains pending, the plaintiffs did "stipulate and agree" in the recent Global Settlement that "Defendant Rebecca Martorello resigned from Bellicose in 2013 and never had any substantive or non-ministerial role in that company, Eventide, their management companies, or, more broadly, the tribal-lending servicing industry . . . [and further . . .] that Rebecca Martorello: (1) had no control over, influence on, or involvement with Big Picture's or Red Rock's loan terms, agreements, processes, or operations; (2) she had no role in either Big Picture's or Red Rock's lending operations; and (3) she had no involvement, directly or indirectly, in issuing, servicing, or collecting on any of Plaintiffs' or other Settlement Class members' loans."

with GT's prior opinions given to Matt at the outset of the arrangement, she still maintains GT's

positions about the legality of LVD's loans (*See Eventide Docket 15, Exhibit A*).  Ms. Weddle

testified that her opinion remains that the Tribe is not bound by state usury laws, not because of

immunity, but because Congress has never acted to limit the ability for tribes to regulate online

consumer lending or authorized states to interfere with this form of Indian Commerce.  Ms.

Weddle also testified that GT's consumer borrower documents were "absolute platinum

standard" at the time and "the tribe [has] the sovereign ability to be in the business," and

confirmed that "absolutely" Matt was lawfully providing services pursuant to the GT

documents.[9]  She further testified that:

- "the whole point of the deal was to allow [LVD] to establish loans pursuant to its tribal laws… and where state laws would not be applicable"

- In 2011, 2014, 2016 and still today "states ha[ve] no authority to regulate tribal lending" and GT would not have been involved in the transaction if the loans were illegal, nor would GT further any RICO enterprise.

- She continues to agree with everything in GT's August 19, 2013 legal opinion, which applied to LVD's lending and involved more than a dozen GT lawyers and was signed by Troy Eid, former United States Attorney for the State of Colorado and co-head of Federal Indian law at GT.

- No cases, or regulatory efforts, caused her to question her belief that tribal law applied to the consumer lending contracts and that she never believed (and still does not believe) there was anything unlawful about LVD's loans.

- "At no point was Mr. Martorello, or any entity he was ever involved in, controlling anything."  The "Tribal nature of the entities was never in doubt."; and

- The economics between LVD and Martorello's company caused her no concern, were "standard" and "not uncommon," and "there was no restriction in 2011 and there is no restriction today" as "tribes as governments are free to retain whatever services they desire on terms that are acceptable to them.  There is no indicia of the amount of moneys or the degree of success of a tribal business that somehow

---

[9] The entirety of Matt's conduct in connection with LVD was through his role as officer and owner of entities through contractual relationships that were established by GT in 2011, by Conner and Winters, LLP Federal Indian law group in 2016, and by Loeb & Loeb, LLP in 2020.

influences its tribalness."

43.     Matt argued to the *Williams* court that he could not possibly *know* that state law
would apply to the LVD loans.  The only way he could *know* that is if he knew what the proper
legal test was, and that it fails when applied here.  But it is impossible that Matt could somehow
*know*, contrary to the legal advice he was given, that abstract common law predicated on
longstanding and complex *principles* of tribal sovereignty involving more than forty-years of
Supreme Court cases would be determined *not* to preempt state regulations over the Tribe's
consummation of loans on its reservation with certain interest rates.  Matt relied on highly
reputable counsel that opined and still maintain that based on the complex case law, the loans
were legal and governed by tribal law and that state law would not apply.  In addition, the
Tribe's lending business (along with dozens of other tribes who operate similar online lending
businesses today) has been registered with and co-regulated with the Consumer Financial
Protection Bureau since 2014.  Additional regulatory agencies have likewise worked with LVD
in connection with its business and asserted their understanding that tribal sovereignty preempts
application of state law (*See* Eventide Docket 15 Exhibit A, generally).

44.     Indeed, while the United States Supreme Court may not have decided the precise
issue here, its decision in *Marquette Nat. Bank of Minneapolis v. First of Omaha Service Corp*.,
439 U.S. 299, 318 (1978) clearly supports the application of tribal law and legality of the loans.
*Marquette* held that "citizens of one State [a]re free to visit a neighboring State to receive credit
at foreign interest rates."  The Supreme Court even acknowledged that this "exportation" of
interest rates impairs the effectiveness of state usury laws, and that "[t]his impairment may in
fact be accentuated by the ease with which interstate credit is available by mail through the use
of modern credit cards." *Id.* at 318-19.  "Although the convenience of modern mail permits

[residents of one state] to receive loans without visiting [another state]," the Supreme Court

rejected the argument that the usury law of the borrower's state could be applied to these loans.

*Id.* at 311.  It concluded that "the protection of state usury laws is an issue of legislative policy"

that must be addressed to Congress, not the courts. *Id.* at 319; *see also Cades v. H7R Block, Inc.,*

43 F.3d 869, 874 (4th Cir. 1994).[10]

45.    With respect to lower court opinions, the two decisions that come closest to

addressing the exact question here are the federal District Court of South Dakota's decision in

*FTC v. Payday Fin., LLC,* 935 F. Supp. 2d 926, 936 (D.S.D 2013) and the Second Circuit's

decision in *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.,* 769 F.3d 105 (2d

Cir. 2014).  These cases either affirm the conclusion that the LVD loans are governed by tribal

law or, at a minimum, make clear that the legality determination can be made only after a highly

particularized factual inquiry into the nature of the state, federal and tribal interests at stake and

thus the circumstances here could not possibly lead to the conclusion that Matt somehow should

have known, contrary to his counsel's opinion, that Virginia law would apply.

46.    In *FTC v. Payday Fin., LLC,* 935 F. Supp. 2d 926, 936 (D.S.D 2013), the South

Dakota district court scoured federal Indian law with regards to a *non*-tribal online lending

business operating on a reservation and found that a borrower's geography is not determinative.

Instead, loans contracted by phone or internet "have the same effect on the nonmember

[borrower], the tribe, the lender, and the reservation" as loans contracted in person.  *Payday Fin.,*

*LLC* also found that, "[w]hen a nonmember enters into a commercial transaction with a tribal

member or reservation-based tribal business, receives a benefit coming from the reservation as a

---

[10] In *Marquette,* the Supreme Court reasoned that a bank located in Nebraska extended credit there to
Minnesota credit card holders by paying the sales drafts of Minnesota merchants and banks.  *Id.* at 311-
12.  Likewise here, LVD extends credit on the reservation to borrowers from other jurisdictions.

result, and consents in a written contract to tribal jurisdiction, that nonmember has engaged in the sort of consensual relationship with the tribe or its members, through commercial dealing, that would subject the nonmember to tribal jurisdiction."  This is consistent with *Marquette*.

47.     The Second Circuit in *Otoe* addressed the legality of tribal loans to borrowers in New York, and determined that the question is controlled by (a) a legal incidence test or "[t]he 'Who,' 'Where,' and 'What' of the Indian Commerce Clause" (i.e. "who a regulation targets and where the targeted activity takes place" and "even if the 'who' and 'where' are clear, a court must still understand 'what' a regulation targets…") and (b) the balancing test established in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  *Otoe*, 769 F.3d at 112-14.

48.     The Second Circuit concluded that "[a] court might well find that the tribes' sovereign interest in raising revenue militate in favor of prohibiting a separate sovereign from interfering in their affairs." 769 F.3d at 112 n. 4. The Court also acknowledged that although the loans were collected in New York, "[a] court might ultimately conclude that… the transaction being regulated by New York could be regarded as on-reservation, based on the extent to which **one side** of the transaction is firmly **rooted** on the reservation." *Id*. at 115 (emphasis added).[11]

49.     In *Otoe*, fully aware of the argument that the goals of usury laws are to protect borrowers who were not physically on the reservation when they received the loans, even an esteemed Second Circuit panel still could not conclude whether New York's regulations if applied to the tribes violated the Indian Commerce Clause of the Constitution.  *Id.* at 115-117.[12]

---

[11] *See Opportunity Fin. v. Hewett*, California Superior Court, Case 22STCV08163, October 30, 2023 opinion (discussing how the act of usury--and thus the usury at risk of being preempted--is determined at "inception" of a loan requiring a payment of usury, thus informing the "what" and "where" of state usury laws that are preempted).

[12] The Second Circuit concluded based on the ambiguous and insufficient record before it that the lower court had not abused its discretion in concluding that the tribes had not made a sufficient showing of

Case 24-90016-mxm11    Doc 6    Filed 09/20/24    Entered 09/20/24 14:27:40    Desc Main
Document    Page 21 of 28


50.     Notwithstanding the common law precedents and the evidentiary record regarding the legal opinions that Matt's counsel had rendered, on June 8, 2023 the federal district court in Virginia rule that Virginia law applies to LVD's loans, and on June 16, 2023, granted partial summary judgment on elements of plaintiffs' RICO claim, concluding not only that Virginia law governed, but also that Matt need not know of the loans illegality to establish a RICO violation. The court's subsequent written opinion would explain that the determination that Virginia law applied was based on the Fourth Circuit case *Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021).

51.     *Hengle*, however, did not discuss the Indian Commerce Clause or federal preemption and did not analyze the balance of state, federal and tribal interests at stake or whether the loan transactions were "firmly rooted" on the reservation, because those issues were not before it.[13] Although the *Hengle* Court concluded that Virginia law applied because the choice of law provision in the tribal loan documents violated Virginia public policy, it did so in the context of the tribe's motion to dismiss, where the allegations of the complaint are accepted as true. At that stage of the litigation, the tribe had not raised federal Indian law issues because the tribe believed that Virginia choice of law rules and Virginia Supreme Court precedent alone resolved the issue. 19 F.4th at 350-51 ("Defendants assert that the Supreme Court of Virginia's decision in *Settlement Funding, LLC v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007), forecloses Plaintiffs' argument at the outset…")).

---

likelihood of success to warrant the injunctive relief they were requesting against the New York regulators. *Id.* at 118.

[13] "The question currently before us is the strength and import of Virginia's public policy against unregulated usurious lending, **not the proper application of Virginia law to these loan agreements**". 19 F.4th at 351, FN10 (emphasis added). Whether or not the tribe had to be licensed was "inapposite to the question before th[e] [c]ourt." *Id.*

21

52.    Plaintiffs in the *Williams* case thereafter moved to amend the order to also adjudge that Matt knew about and facilitated the RICO enterprise.  Given the court's rulings that Virginia law governed and that plaintiffs need not prove he knew the loans were illegal, Matt conceded that there were no remaining triable issues of fact on the RICO conspiracy claim.  On June 26, 2023, at a hearing on Matt's motion for summary judgment, the district court further orally ruled that liability under RICO also does not require proof the defendant controlled the RICO enterprise.  At that point, to avoid a wasteful trial and speed up appellate review of what he believed were erroneous legal determinations, Matt stipulated that there were no remaining triable issues of material fact regarding the substantive RICO claim.  The parties thereafter stipulated on damages (which are statutorily determined to be three times the amount by which the interest exceeded the usury limit), and a judgment in the amount of approximately $43 million was entered.

53.    Matt appealed the judgment to the Fourth Circuit, and Holland and Knight has long been fully funded to handle that appeal.  The appeal raises three fundamental issues.  First, that internet loans made by an arm of an Indian tribe on its reservation are governed by tribal law not the law of the borrower's state.  Success on this issue would result in the judgment being vacated and the lawsuit dismissed.  Second, that the case should be dismissed under Fed. R. Civ. P. 19(b) because the tribal lender and its tribe are required parties who have sovereign immunity and cannot be joined.  Success on this issue would likewise result in the judgment being vacated and the lawsuit dismissed.  Third, that a RICO violation for collection of an unlawful debt requires proof that the defendant knew that the debt was unlawful and that the rate charged was at least twice the legally enforceable rate.  Success on this issue would result in the judgment being vacated and the case being remanded for determination on scienter.

54.     After entry of the judgment and filing of the appeal, the plaintiffs became very aggressive in their enforcement actions.  Although Matt defended and attempted to stave off those actions, Big Picture had stopped paying the amounts it owed to Eventide, which was both the salary Matt received to support his wife and three young children, and his primary source of income to defend himself.  It soon became evident that he could not continue to defend himself in multiple jurisdictions or hold everything at bay until the Fourth Circuit ruled.  Accordingly, even though he believed he would prevail in his appeal, he began discussions with class counsel regarding a possible settlement that would include all borrowers from the Tribe nationwide and which would also help him avoid a personal bankruptcy filing.

55.     After lengthy negotiations, the contingent class settlement (the Global Settlement) that would resolve his liability for the judgment as well as his liability (and Eventide's liability) to consumer borrowers from the Tribe nationwide through May 1, 2024, was reached.  The plaintiffs sought preliminary approval of the Global Settlement, and the Virginia district court preliminarily approved the settlement on June 4, 2024.  The parties await the bids to come in over the next few weeks.

### *The IRS Penalties*

35.     The Bluetech Trust, which Matt and its trustee settled in 2010, and the Capstone Trust, which the Bluetech trustee settled in 2013, are both foreign trusts pursuant to section 7701(a)(31) of the Internal Revenue Code.  As "grantor trusts" Matt is deemed the "tax owner" of each trust for U.S. tax purposes, even though he has no control over, and is not a beneficiary of, either trust.  As the U.S. tax owner, Matt is responsible for ensuring that the trustee timely files an Annual Information Return (Form 3520-A).

36.    Even though no tax was ever unpaid, and no income or assets ever unreported, underreported, or untimely reported, over a three-week period in 2022 substantial penalties were assessed against Matt under the assertion that he failed to ensure that the trustee of the 2013 Trust timely filed its Form 3520-A for the years 2014 through 2017.  Those penalties should have been abated but not for a mistaken misunderstanding about Matt's "filing history."

37.    The 2014 through 2017 annual information returns for the 2013 Trust were in fact all timely filed.  The sole cause of the penalties was a 2018 change in methodology by which Matt and the trustee's CPA filed those the 2018 forms, when they changed tax advisors.

38.    The filing methodology that Matt's prior CPA elected for the years 2013 through 2017 was a *consolidated* filing methodology for the two foreign trusts' informational returns pursuant to which the 2013 Trust was reported as a wholly-owned asset, or sub-trust, of the 2010 Trust (Bluetech), a methodology the CPA's sworn statement notes was utilized after the CPA conferred with tax counsel.  A disclosure statement listing all the 2013 Trust's assets and income (*i.e.*, the same information that would have been included on its own annual information return had it been filed separately) was attached to the information return for Bluetech.  This *consolidation* approach was taken for each year in 2013, 2014, 2015, 2016, and 2017.  Despite several successful audits of Matt, this methodology was *never* questioned by the IRS until a new CPA's bifurcated filing methodology triggered the IRS to penalize him for it in 2022.

39.    After moving to Dallas in 2017, Matt retained new local tax representation for 2018. The new firm advised that it preferred a different filing methodology for reporting the same trust information.  Specifically, rather than filing a *single* form 3520-A reporting the 2013 Trust as an asset of Bluetech, as the prior firm had always done, the new firm's reporting methodology was going to involve preparing and filing a *separate* Form 3520-A for *each* trust.  Moreover, even

though all the assets and income of the 2013 Trust had been previously reported on Bluetech's timely form 3520-A (and Forms 3520 and 1041 as well) for every year from 2013 through 2017, Matt's new tax firm advised filing *bifurcated* form 3520-As and 1041s for the 2013 Trust with respect to each of those years.

40.     Matt consulted with his prior CPA firm about this approach, and that firm continued to maintain that the consolidated filing method was indeed sufficient compliance.  Faced with that discrepancy for the first time, Matt prudently authorized an expensive effort to have his new tax advisor file *separated* Forms 3520-A, 3520 and 1041 for 2013 through 2017.  These were not corrective filings as to the 2013 Trust, but rather supplemental filings intended to establish historical context for the 2018 forms that the new CPA firm would file using the bifurcated methodology.  The new firm filed those in September 2019. It is this conservative exercise to *ensure* compliance as to the forms that resulted in substantial punitive penalties being issued in 2022.

41.     The IRS eventually reviewed the 2013 supplemental filing and accompanying statement of reasonable cause, and on January 10, 2023, the IRS issued a letter stating that "we reviewed the information provided and determined no action is necessary on your account."  With the same information applied to the same situation spanning 2014 through 2017, the same "no action is necessary" should have prevailed for those tax years as well.  It appears that penalty abatement for tax years 2014 through 2017 has not occurred because the other years were tracked within the IRS *not* as if the penalties all occurred at one time in 2022, but rather as if the CPA had done it wrong in 2013 and was penalized in 2013 but then proceeded to repeatedly do it in the same incorrect manner year after year, each time ignoring a flawed filing methodology.  Indeed, the stated reason for not abating those penalties was that the "account history shows you were

subject to similar penalties in the past. We find no indication that you took steps to correct this situation." Plainly, that assessment is inaccurate. It appears that systems issues within the IRS have caused the IRS to misunderstand the chronology of events, given that Matt was in fact *not* subject to any penalties until one point in time, in 2022.

42.     Moreover, only one of the four penalty disputes has been scheduled for appeal (the penalty for 2017). Matt's tax counsel had requested the IRS "file" pertaining to the 2017 penalty more than one-year ago, as he must do to prepare for the appeals conference. Although requested more than one-year ago, and the time under the law by which the IRS must provide it less than sixty days, the IRS has still yet to provide the file. As a result, the appeal conference on the 2017 penalty has not ensued and the other three penalties have not been scheduled at all, despite being issued and contested two years ago.

43.     The inability to timely resolve these pending tax penalties, which aggregate over $8.5 million (and which should be abated in full) could jeopardize Matt's ability to fulfill commitments he made in relation to how the Global Settlement is funded. Matt needs an expeditious resolution of these penalties and will file a motion under section 505 of the Bankruptcy Code seeking a determination that he owes no penalties.

### *Conclusion*

44.     In sum, Matt comes to this honorable Court humbly seeking closure and resolution so that he and his family can move forward. To do so, Matt believes that his principal objectives in this bankruptcy case must be (i) to expeditiously resolve the erroneous IRS penalties; (ii) to consummate the Global Settlement if possible, and provide for equitable treatment to all his bona fide creditors (including the trust that will have sold shares it owned to fund the settlement); (iii) to resolve the Tribal Court Lawsuit against him in coordination with

Eventide; (iv) if necessary to obtain his fresh start, to obtain necessary findings and protections

from Big Picture's ongoing lending conduct; and v) if the Global Settlement cannot be

consummated, to resolve all alleged RICO, usury and other claims against him in respect of the

Tribe's loans to consumer borrowers in a single, centralized forum.


DATED:  September 20, 2024              Respectfully submitted,

                                        */s/ Daniel P. Winikka*
                                        Daniel P. Winikka (TX 00794873)
                                        **WINIKKA LAW, PLLC**
                                        7522 Campbell Road, Suite 113, #419
                                        Dallas, TX 75248
                                        Telephone:  (469) 384-7710
                                        Facsimile:   (469) 384-7709
                                        dan@danwinlaw.com

                                        **PROPOSED COUNSEL FOR DEBTOR IN
                                        POSSESSION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of September 2024, he caused to be served a true and correct copy of this Debtor's Statement Regarding Commencement of Chapter 11 Case, by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

*/s/ Daniel P. Winikka*
Daniel P. Winikka

3