Patrick J. Neligan, Jr.
State Bar. No. 14866000
John D. Gaither
State Bar No. 24055516
NELIGAN LLP
4851 LBJ Freeway, Suite 700
Dallas, Texas 75244
Telephone: 214-840-5300
pneligan@neliganlaw.com
jgaither@neliganlaw.com

Kristi C. Kelly, *pro hac vice* forthcoming
Andrew J. Guzzo, *pro hac vice* forthcoming
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 - Telephone
(703) 591-0167 - Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Counsel for the Virginia Borrowers*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| **MATTHEW MARTORELLO** | § | CASE NO.  24-90016-mxm-11 |
| | § | |
| **DEBTOR** | § | |

| | | |
|---|---|---|
| **LULA WILLIAMS, DOWIN COFFY, GEORGE HENGLE, MARCELLA SINGH, AND GLORIA TURNAGE,** | §§§§ | |
| **Plaintiffs,** | §§ | |
| **v.** | §§ | **ADV. PRO. NO. _____** |
| **MATTHEW MARTORELLO,** | §§§ | |
| **Defendant.** | § | |

### PLAINTIFFS' COMPLAINT TO EXCEPT JUDGMENT AND CLAIMS FROM DISCHARGE UNDER BANKRUPTCY CODE SECTION 523(a)(2) AND (6)

Plaintiffs, Lula Williams, Dowin Coffy, George Hengle, Marcella Singh (as administrator of the estate of Felix Gillison, Jr.), and Gloria Turnage, on behalf of themselves and the class (the "Virginia Borrowers") certified by the United States District Court for the Eastern District of Virginia in *Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461, file this Complaint for Declaratory Judgment against Defendant/Debtor Matt Martorello ("Martorello"). In support thereof, Plaintiffs state as follows:

## OVERVIEW OF THE CLAIMS

1.      **"The fresh start of a bankruptcy discharge is intended to provide a new beginning for honest but unfortunate debtors, not racketeers."** *In re Ott*, 218 B.R. 118, 125 (Bankr. W.D. Wash. 1998) (internal citations omitted). Because the fresh start is only available to "honest debtors," § 523(a) of the Bankruptcy Code establishes exceptions to a debtor's ability to discharge certain types of misconduct, such as money obtained under false pretenses, false representations, actual fraud, or willful and malicious injuries. 11 U.S.C.A. §§ 523(a)(2), 523(a)(6).

2.      Courts have routinely applied these exceptions to violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See, e.g., In re Kaplan*, 634 B.R. 673, 689 (Bankr. E.D. Pa. 2021) (finding that portions of a RICO judgment were not dischargeable pursuant to § 523(a)(2)(A)); *In re Sinclair*, 2017 WL 5952160, at *52 (Bankr. E.D. Cal. Nov. 29, 2017) ("The RICO Judgment and obligations thereunder having been determined nondischargeable, this court's judgment for nondischargeability shall provide that the RICO Judgment shall be enforced through the District Court[.]"); *In re Nix*, 92 B.R. 164, 167 (Bankr. N.D. Tex. 1988) (holding that treble damages under RICO were nondischargeable under section 523(a)(6)); *In re Wien*, 155 B.R. 479, 489 (Bankr. N.D. Ill. 1993)("[T]his Court will not undermine the effect of RICO by allowing the discharge of the district court's award of treble damages."), *aff'd sub nom. Wienco, Inc. v. Scene Three, Inc.*, 29 F.3d 329 (7th Cir. 1994); *In re Fugazy*, 157 B.R. 761, 766 (Bankr. S.D.N.Y. 1993) (granting summary judgment that the exception to discharge applied where "[t]he debtor acted willfully and maliciously when he committed the acts which underly the RICO Trial.")

3.      Over the past seven years, the United States District Court for the Eastern District of Virginia has presided over Plaintiffs' claims against Martorello. *See generally Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461. During that time, that matter has been before a single

judge (Robert E. Payne), who has issued almost **thirty (30)** memorandum opinions in the *Williams* matter and two related cases styled as *Galloway v. Big Picture Loans*, Case No. 3:18-cv-406 (E.D. Va.) and *Galloway v. Justin Martorello*, Case No. 3:19-cv-406 (E.D. Va.)—many of which contain both findings of fact and conclusions of law.

4.      As Judge Payne has explained, this case arises from a "rent-a-tribe" scheme, which is a term that describes the practice of "payday lenders partnering with Native American tribes in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury." *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 52–53 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023). After an evidentiary hearing in November 2020, Judge Payne concluded that, among other things, that: (1) "there is substantial (and largely unrebutted) evidence that, throughout the relevant class periods, Martorello had de facto control of Red Rock and Big Picture's lending operations," (2) that "Martorello was both highly instrumental and heavily involved in the LVD's entrance into the business of payday lending," (3) that "Martorello was functionally in charge of the lending business and the Tribal 'managers' were 'rather meaningless,'" (4) "[a]nd, even after the LVD restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show." *Williams*, 339 F.R.D. at 52–53. These findings were affirmed by the United States Court of Appeals for the Fourth Circuit. *Williams* 59 F.4th at 90 (finding that the district court did not err "in its factual findings that Martorello was still largely in charge of the lending operations after the restructuring and that he controlled the tribal lending entities."). The Fourth Circuit further affirmed the district court's finding that "Martorello lied" about his involvement earlier in the proceeding. *Id*. at 89.

5.      Following six years of litigation and after cross-motions for summary judgment, a Final Judgment Order was entered against Martorello in September 2023 in the amount of $43,401,817.17 in favor of the Plaintiffs and other borrowers in Virginia who took out loans from the illegal lending enterprise. *See* Ex. 53, Sept. 22, 2023 Final Judgment Order.

6.      By this adversary proceeding, Plaintiffs request entry of judgment excepting the Final Judgment Order and their claims against Martorello from discharge under §§ 523(a)(2) and/or 523(a)(6). In short, Plaintiffs request entry of this judgment because Judge Payne's findings in the *Williams* litigation and subsequent judgement have established that Martorello was the "mastermind" behind a criminal lending scheme that obtained money from consumers under false pretenses and false representations. The criminal lending scheme was not only designed to deceive consumers about the true lender of the loans (and conceal the role of Martorello and his companies), but also to deceive consumers about the applicability of state and federal law through a series of misrepresentations about the waiver of laws in the loan contracts. The Plaintiffs' claims against Martorello should therefore be excepted from discharge.

## **PARTIES**

7.      Plaintiffs Lula Williams, Dowin Coffy, George Hengle, Marcella Singh (as administrator of the estate of Felix Gillison, Jr.), and Gloria Turnage are individuals who reside in Virginia. Plaintiffs are the class representatives of the class certified by the United States District Court for the Eastern District of Virginia. *Williams*, 339 F.R.D. at 52. The Fourth Circuit affirmed the certification of this class. *Williams*, 59 F.4th at 68.

8.      Matthew B. Martorello is an individual residing in Dallas, Texas. Martorello may be served with process at 3805 Greenbrier Drive, Dallas, Texas 75225.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157.  Venue is proper before this Court under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND[1]

**A.      Overview of the rent-a-tribe lending model.**

10.      "This case, and the tribe-payday lending partnership it challenges, is not unique." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019).

11.      Over the last decade, "[c]ourts across the country have confronted," these "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *Id.*

12.      Under this model, payday lenders use "Native American tribal entities" as "the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in doing so, to preclude enforcement of the interest rate caps in state usury laws." *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *2 (E.D. Va. Nov. 18, 2020) (citing Nathalie Martin & Joshua Swartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012)).

13.      Over the last decade, government regulators and private class actions have returned hundreds of millions of dollars to consumers and cancelled more than $1 billion in loans.[2]

---

[1] The following facts provide the basis for Judge Payne's Final Judgment Order in favor of the Plaintiffs against Martorello and thus cannot be relitigated.  The facts are set forth to provide this Court with the factual background underlying the Plaintiffs' claims against Martorello.

[2] *See, e.g., Turner v. Zest Finance, Inc.*, Case No. 3:19-cv-00293 (E.D. Va.), June 30, 2020 Final Approval Order at Dkt. 114 (approving settlement providing $18.5 million in cash and $170 million in debt relief to borrowers); *Galloway v. Williams*, No. 3:19-CV-470, 2020 WL 7482191,

14.     Dozens of other actions have been heavily litigated throughout the country, including criminal proceedings that have resulted in the felony convictions of three pioneers of the tribal lending models.[3]

15.     Although each of these enterprises have minor variations, most of them follow the same basic pattern: a tribal lending entity is held out as the lender on these illegal loans, but it contractually relinquishes the right to control and operate the key aspects of the lending business.

16.     Behind the scenes, non-tribal outsiders control the day-to-day operations of the lending business and reap the vast majority of the profits.

**B.     Martorello segues from offshore to tribal lending.**

17.     After working several years at KPMG, Martorello started online lending in 2008. Ex. 1, Martorello Dep. 26:9-14. Martorello had an ownership interest in an online lending company called "MMP Finance," which made online "payday loans." *Id.* at 33:18-35:20. Utilizing the domain name "peppercash.com," Martorello made usurious loans that claimed to be "governed by the laws of Costa Rica." Ex. 2 at ROS002-0000681.

18.     In 2011, Martorello was introduced to Robert Rosette, who was "a very well-known attorney" in the tribal lending industry. Ex. 3 Merritt Dep. at 32:7-11.

_____

at *1 (E.D. Va. Dec. 18, 2020) (approving settlement providing $8.7 million in cash and over $100 million dollars in debt relief for over 300,000 consumers); *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of $60 million settlement and more than $380 million dollars in debt relief to consumers); *Gibbs v. TCV, V, LLP*, Case No. 3:19-cv-00789 (E.D. Va.), Mar. 29, 2021 Final Approval Order at Dkt. 95 (granting preliminary approval of a $50.5 million dollar fund and $380 million dollars in debt relief).

[3] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

19.     Martorello subsequently paid Rosette to connect him with the LVD. Ex. 4 at Martorello_008958 (email from Martorello explaining that if "I wanted to get a new contract," *i.e.*, servicing agreement, "I'd probably call a broker who would introduce me to tribes and charge me a few hundred K (we sent how much we paid for the initial intro in a prior email).").

20.     Prior to meeting with the LVD's Tribal Council, Martorello worked with Rosette and his business partner, Flint Richardson, to memorialize the structure and terms of the venture. *See, e.g.*, Ex. 5 at Rosette_Revised _052501.

21.     Martorello wrote several emails, asking about this new business model. *Id.* at 052499-052501.

22.     One of Martorello's questions was whether "the Tribal Lending entity" would have "a Tribal Management Company, which was going to be the Bellicose customer[?]" *Id.* at 52500.

23.     In response, Richardson said "NO," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE <u>BUT ARENT INVOLVED IN THE BUSINESS</u>." *Id.* at 52498 (caps in original, underline added).

24.     And when asked by Martorello to further elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS'. THE SERVICER, <u>BELLICOSE OPERATES THE BUSINESS COMPLETELY</u>." *Id.*

25.     In a separate email, Martorello also asked "Is there an entity name for the tribal LLC," and then explained it should have "a unique name that doesn't expose our relations if another lender tribe entity had problems." Ex. 6 at ROS002-0000695.

26.     Richardson responded: "You can name it !!" *Id.*, and Martorello later indicated that he liked the name "Red Rock Tribal Cash, LLC." Ex. 2 at ROS002-0000681.

27.     Over the next few months, Martorello worked together with Richardson, Rosette, and others to complete other items to establish the lending venture, including creation of new bank accounts in the name of Red Rock and ACH applications. Ex. 7 at ROS002-000064-66.

**C.     Bellicose VI and Red Rock Enter into the Initial Servicing Agreement.**

28.     On October 25, 2011, Martorello's wholly owned company, Bellicose VI, Inc. ("Bellicose"), entered into a Servicing Agreement with Red Rock Tribal Lending, LLC, which memorialized the initial structure of the lending enterprise. *See generally* Ex. 8.

29.     This contract's recitals indicate that the Tribe desired "to engage in internet-based unsecured lending," and further provided that Red Rock was "seeking managerial, technical, and financial experience and expertise for the development and operation of the new Unsecured Lending Business." *Id*. at Martorello_026259-26260.

30.     The recitals indicated that Bellicose was "willing and able to provide such assistance, experience, expertise and instruction" to facilitate the unsecured lending business. *Id*.

31.     Consistent with this, a section of the contract entitled "Engagement of Servicer," establishes that Red Rock was engaging Bellicose to provide "business management, consulting and professional services," and further delegated to Bellicose "the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." *Id* at Martorello_026263.

32.     Among other things, the contract specifies that Bellicose's duties include: the "[s]creening of and selecting service providers and lenders, and negotiating agreements with such service providers and lenders on behalf of [Red Rock] on such terms and conditions as [Bellicose] may reasonably determine to be appropriate[,]" and preparation of "suggested practices and recommendations" regarding "operations of" Red Rock[.]" *Id*. at Martorello_026267.

33.     The Servicing Agreement also allowed Bellicose to enter into contracts in Red Rock's name and required delivery "of all contracts executed by [Bellicose] on behalf of [Red Rock]" on a "monthly basis." *Id*. at Martorello_026268.

34.     Bellicose also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation" of Red Rock. *Id.* at Martorello_026273.

35.     Bellicose also had the right to "sweep [Red Rock's] bank account amounts into [Bellicose's] bank accounts" to receive its share of the proceeds. *Id.* at Martorello_026265.

36.     Bellicose had "sole signatory and transfer authority over such bank accounts" opened in the name of Red Rock. *Id.* at Martorello_026270.

37.     The contract further established that Red Rock would receive 2% of the gross revenue collected on the loans minus charge offs. *Id*. at Martorello_026265 (establishing the fee agreement between Red Rock and Bellicose, including payment of the "Tribal Net Profits"); *Id*. at Martorello_26263 (defining the calculation for "Tribal Net Profits" as "the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis[.]").

38.     Red Rock's revenue share, however, was further reduced by 50% to pay a brokerage fee to another company owned by Rosette, Tribal Loan Management, LLC. *Id.* at Martorello_026279.

39.     This brokerage fee was paid directly by Bellicose. *Id.*

40.     Because "the success of the [lending] business" was "based in large part upon the services provided" by Bellicose, it received "performance-based fee equal to that amount remaining after payment of Tribal Net Profits, Servicer advances, and all Servicing Expenses." *Id*. at Martorello_026265.

41.     The Servicing Agreement between Red Rock and Bellicose was signed by Martorello. *Id.* at Martorello_026292.

**D.     SourcePoint and Red Rock enter into the Amended Servicing Agreement.**

42.     In July 2012, Martorello raised concerns with Rosette's 50% cut of Red Rock's revenue. At this time, Martorello wrote an email stating that "TLM shouldn't be profit sharing like an owner." Ex. 9 at Rosette_Revised _046397.

43.     This component "really [was] an issue to" Martorello, who believed TLM's revenue share put his "capital lent at risk." *Id.*

44.     He thought it was "very important we remove TLM as a 'profit sharing 50% of retained earnings broker' because it sounds like '50% owner,'" which "negates the entire tribal owned component that makes [him] as financer/Servicer feel like [he was] safe." *Id.*

45.     Wichtman, Rosette's law partner, agreed with these concerns and responded "the TLM piece is problematic for a whole host of reasons," and while she did not "have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a fee paid to TLM," that "50% of the Tribe's profits ha[d] always been a bit excessive" in her opinion. Ex. 10 at Rosette_Revised _044603.

46.     On August 1, 2012, Rosette and LVD agreed to recharacterize the broker's fee pursuant to a "Side-Letter Agreement." Ex. 11 at ROS002-0001919.

47.     Rather than paying the "broker's fee," LVD paid a flat-fee of $960,000.00 to TLM for "professional services from June 2011 through July 2012," including "the development of all Tribal Consumer financial services laws and associated regulatory framework for review and consideration by Tribal client." Ex. 12 at ROS002-0001918.

48.     To effectuate this change, Red Rock entered into an Amended and Restated Servicing Agreement dated July 31, 2012, with another company owned by Martorello, SourcePoint VI, LLC. Ex. 13 at Martorello_003474.

49.     Other than the removal of the broker's fee provision, there were no other changes to the original servicing agreement, including the fee structure and delegation of responsibilities. *Compare* Ex. 13; with Ex. 8.

50.     Martorello signed the Amended and Restated Servicing Agreement, which remained in effect until January 26, 2016. Ex. 13; *see, e.g.*, Ex. 14, Martorello Depo. 30:8-15 ("Q. And was this servicing agreement ever amended during the time you were president of SourcePoint VI? A. This – I don't recall any amendments to this document at any time.").

**E.     Regulators begin attacking the business model in 2012 and 2013, prompting Martorello to contact Rosette regarding a potential restructure.**

51.     As early as December 2012—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 15 at Martorello_038990.

52.     In an e-mail to a business valuation expert, Martorello wrote that he had "some urgent questions" for them "on valuation" of his business. *Id.*

53.     Among other things, Martorello asked how to value illegal businesses, such as online poker sites, medical marijuana stores, and "**a drug cartel**." *Id.* (emphasis added).

54.     Martorello further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id.*, at Martorello_038990-038991.

55.     Martorello was in possession of a 20-page legal opinion, concluding that he could be liable "for **aiding and abetting felony crime**" in states like Georgia. *Id.* (emphasis in original).

56.     As early as April 2013, Martorello began e-mailing Rosette about restructuring the arrangement to reduce Martorello's liability, writing: "Let's zero in asap on minimizing my risk for being individually liable like [Colorado] just successfully did to Butch [W]ebb." Ex. 16 at Rosette_Revised_048497.

57.     Over the next six months, regulators continued to threaten to take action to stop Red Rock's illegal practices. *See, e.g.*, Ex. 17, May 2013 Ltr. from Conn. Dep't of Banking.

58.     On August 6, 2013, the New York Department of Financial Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red Rock.[4]

59.     Six days after the issuance of the cease and desist, Rosette had drafted a complaint against the NY DFS "for LVD's consideration." Ex. 18 at Rosette_Revised_041064.

60.     In an e-mail to Martorello, Rosette wrote that he "believe[d] strongly if we do nothing we may forever lose the tribal online lending opportunity," and he further added it would be "impossible to unwind or undo what the State of New York (in collaboration with federal agencies) have started without a legitimate piece of litigation being filed." *Id*.

61.     In a separate e-mail to Martorello, Wichtman echoed these concerns, writing "what do we achieve by laying low waiting for the next bomb to drop - hoping that it doesn't blow us up?" Ex. 19 at Rosette_Revised_049126.

62.     Martorello expressed concern with joining the litigation. *Id*. at 049125. According to Martorello, the filing would "open the doors" and result in "counter attacks from all sides," and it would be "game over really quick." *Id*.

---

[4] *See, e.g.*, The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

63.     The lawsuit was filed on August 21, 2013. It sought a preliminary injunction to prevent interference with the business during the pendency of the case. *See generally Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. Sept. 2013).

64.     The court denied this request and found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Id.*

65.     The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring on "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id.* at 360.

66.     Two days after the district court's decision, Martorello wrote that the decision "presents a significant potential liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 20, Rosette_Revised_06304-5.

67.     Martorello further added that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id.*

68.     Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id.*

69.     Two weeks after the decision, Martorello had come up with a solution and approached Robert Rosette regarding a restructure. *See generally* Ex. 21.

70.     In an e-mail dated October 14, 2013, with a subject matter entitled "LVD to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id.*

71.    Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via <u>Equity only</u> membership interest tied to the SPVI subsidiary only." *Id*. (emphasis in original).

72.    Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49." *Id*.

73.    Martorello's e-mail candidly explained that the transaction must be "structured to provide **all entities sovereign immunity**." *Id*. (emphasis added).

74.    Less than six hours after sending the initial restructure e-mail to Rosette, Martorello sent a similar e-mail to the members of LVD's Tribal Council. Ex. 22 at JPB 00988.

75.    In this e-mail, entitled "SPVI Equity Transfer to LVD," Martorello wrote: "Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses." *Id*. (emphasis in original).

76.    This concept, as described by Martorello, was to "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0% profits interest" until four years after the restructure. *Id*.

77.    Martorello further added: the "**Current Manager (myself)** will be locked in as the decision maker for 48 months[.]" *Id*. (emphasis added).

78.    A few weeks later, in an email dated October 29, 2013, Martorello informed Wichtman that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 23 at Rosette_Revised_045573

79.    The repercussions, according to Martorello's e-mail, would be "**certain death**" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id*. (emphasis added).

80.    Martorello further added that "class actions" and "personal threats of enforcement actions against individuals by regulators" has "everyone spooked," causing "several of the biggest

servicers" to "shut down." *Id.*  In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id.*

81.     On December 30, 2013, Rosette circulated a legal memorandum analyzing "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 24 at Rosette_Revised_052248.

82.     On the proposed changes of the structure, Martorello commented that the tribe's percentage of ownership of the company "could easily be increased to whatever the benchmark of confidence is, since equity and profits interest differ." *Id.* at 052247.

83.     Martorello further added that he did not think "100%" ownership was "out of reach," and "some caveats could simply be made." *Id.*

84.      Martorello, however, took issue with Rosette's proposed revenue changes, writing "10% [to the tribal entity] certainly isn't going to work from a business standpoint," and he "might as well be a state licensed lender, as a comp[arison]." *Id.*

85.     Martorello also rejected Rosette's proposed management structure, writing "[a]ll the investors (institutional, personal, and myself) won't allow the deal to occur without being 100% certain adequate [m]anagement resources are in control," *id.* at 052248, *i.e.*, unless non-tribal members like Martorello continued to have final say over operations.

86.     And if challenged, Martorello explained that "[w]hat I think you'd tell a court" is "that if the deal were not done," then the tribe would not know: (1) "if SPVI would be around in 10 days given the industry," (2) execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks." *Id.* at 052247.

87.     Martorello further noted: "Clock is ticking before I end up in a Cash Call type attack though, at which point, I think the deal is about dead." *Id.* at 052258.

**F.    With LVD seemingly uninterested in the restructure, Martorello advocates for a rebrand and threatens to sell the businesses to another tribe.**

88.     Without any significant progress on the restructure, Martorello e-mailed Hazen and Wichtman in July 2014, urging that Red Rock "needs a rebrand." Ex. 25 at Rosette_Revised_058409.

89.     Martorello further wrote that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following *Otoe-Missouria*. *Id.* He added that "it's time to get away from the word '[p]ayday' and the black mark of RRTL before rules come out and things get hotter." *Id.*

90.     To accomplish the rebrand, Martorello suggested "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id.*

91.     Martorello's e-mail concluded that Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing" the rest of the work. *Id.*

92.     In follow-up, Martorello e-mailed Hazen asking "as CEO for RRTL," whether she felt "comfortable representing RRTL to council" on the rebranding. *Id.* at 058408.

93.     In response, Hazen wrote: "I certainly do agree and yes I would be happy to present this to the Council." *Id.*

94.     Three days later, Martorello had "the work and imaging done for ChorusLoans." *Id.* at 058407. Martorello further claimed that "[d]omain names in this space" were "very very rare and hard to come by" and "trying to get a [trademark] to protect it from competition" was "another issue," and "SPVI did a lot of work" to create "Chorus[.]" *Id.*

95.     On August 25, 2014, Martorello e-mailed Wichtman, stating that "Chorus has been sold." Ex. 26 at Rosette_Revised_043437. But Martorello had "another really great brand" known

as Big Picture Loans. *Id*. Martorello attached a document to the email, "Big Picture Site Designs," showing a fully developed website and brand for Big Picture. *Id*. at 043437-57.

96.     Wichtman, who was drafting the resolution for approval by tribal council, responded, "Which one do you want me to use?" Ex. 27 at Rosette_Revised_043435. To which, Martorello replied: "BigPictureLoans.com." *Id*.

97.     The following day, the tribal council approved the creation of Big Picture, as well as its Articles of Organization and Operating Agreement. *See* Ex. 28.

98.     Once the rebrand was accomplished, Martorello sent an e-mail to Chairman Williams on August 26, 2014, providing more details and stressing the urgency of the restructure. Ex. 29 at Rosette_Revised_048541.

99.     In this e-mail, Martorello wrote that Bellicose wanted to "move quickly to transition the business into very capable hands." *Id*.

100.     Martorello further explained that he had "to stress the urgency on [his] end" and "SPVI/BVI are looking to move very quickly on such an exit." *Id*. at 048541-2.

101.     "[R]ather than putting the business on the 'auction block' to the highest bidder," Martorello indicated that he was coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done." *Id*.

102.     Martorello wanted to know "if LVD is interested or not interested," so they could "move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged." *Id*.: *see also* Ex. 30 ("If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).").

103.     Chairman Williams did not respond to Martorello's e-mail that day, prompting Martorello to e-mail Karrie Wichtman later that evening, complaining that he had not heard

"anything back from the Chairman" in response to his e-mail, nor did Martorello get "any sense of excitement from anyone[.]" Ex. 31 at Rosette_Revised_045272.

104.    In this e-mail, Martorello also stated that there would be "a lot of legal details to go through" on the deal and "the seller," *i.e.*, Martorello, "will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." *Id.*

105.    Martorello added: "No need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id.*

**G.    Restructuring became urgent after the Second Circuit's decision.**

106.    Over the next month, the parties did not make significant progress on the key terms or mechanics of the sale, but on October 1, 2014, it became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*.

107.    In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014).

108.    The Second Circuit also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State]." *Id.* (citations omitted).

109.    Against this backdrop, the Second Circuit observed that "[m]uch of the commercial activity at issue takes place in New York." *Id.* It reached all of these conclusions even though LVD/Red Rock never disclosed to the district court or Second Circuit the role of Martorello's companies in the operations. *See generally* 769 F.3d 105.

110.    After the Second Circuit issued its decision, Martorello wrote an e-mail to Wichtman on October 10, 2014, stating: "I can't urge any stronger that LVD not proceed even if [O]toe does." Ex. 32 at Rosette_Revised_043659. Martorello also noted that "SPVI won't be

willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id.*

111.    Ultimately, Wichtman agreed, and as she explained in a subsequent e-mail to Martorello, their best option was to "**go quietly into the night and restructure** based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 33 at Rosette_Revised_001130 (emphasis added).

**H.    Martorello insists on retaining control over the business after the restructure.**

112.    Although Martorello "sold" his companies to LVD, he insisted on control over the business prior to repayment of the promissory note.

113.    For example, in an e-mail dated August 26, 2014, Martorello insisted "**the seller**," "**will have to keep a final say so in business decisions** to protect the business from being destroyed by the new owner before paid." Ex. 31 at 045272 (emphasis added).  Martorello wrote that there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id.*

114.    Similarly, in an e-mail to Wichtman, Hazen, and Chairman Williams dated September 15, 2014, Martorello insisted that "**the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same**." Ex. 34 at Rosette_Revised_040179 (emphasis added).  Martorello further added that "[o]f course[,] a purchase, merger and dissolution are required for a Tribal buyer, and so the name will/jurisdiction of the LLC will change." *Id.*

115.    Despite the creation of the new company, Martorello wrote that it needed to "remain an independent cutting edge" company, which "needs to be run in the same format it is today." *Id.* Martorello added that remaining separately managed by the servicer would aid the "PR

effect" on hiring and retaining professionals "who will understand they risk being labeled by peers as working for some 'illegal' lender" if the companies were combined. *Id*.

116.    They maintained the status quo even though one of Rosette's lawyers, Tanya M. Gibbs, identified the structure—requiring Big Picture "to establish certain relationships with a servicer"—as opening them up to rent-a-tribe arguments similar to "the current class action litigation pending in Vermont, *Gingras & Givens v. Rosette*." Ex. 35 at Rosette_Revised 043997. To avoid this, Ms. Gibbs wondered whether they needed to "to put these things in writing." *Id*.

117.    Martorello insisted on formal control in writing, saying it was "take it or leave it[.]" *Id*. at 043996. Martorello further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*.

118.    Similarly, in an email dated January 14, 2016, *i.e.*, Martorello explained that the enterprise's lenders "care about the person who runs the business of AT." Ex. 36 at Rosette_Revised_043978.

119.    So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," it was sufficient according to Martorello. *Id*.

120.    Martorello further wrote: "**As far as I know, the Manager[s], don't really do anything**." *Id*. (emphasis added).

121.    In closing, Martorello explained that he would leave it up to his attorney, John Williams, on what the transaction documents "say if that jives, and what the authority is of BMF vs the Managers, but if Managers are really only involved per the [operating agreement] to get feedback from the CEO/President" then that seemed "OK." *Id*.

122.    If the managers did "more than that" or the governing documents "say the position of concern are the Managers," then there was "some cleaning up to do," Martorello wrote. *Id*.

123.    Two days after this exchange, John Williams e-mailed Wichtman a draft of the Delegation of Authority Policy to ensure it was clear who had operational control. Ex. 37.

124.    The Delegation of Authority policy, as explained by Wichtman in an email dated January 14, 2016, ensured that "The Tribal Council does not get to make the decision regarding [McFadden's] employment nor determine his salary other than through the budgeting process" [which involves Eventide.] Ex. 38 at Rosette_Revised_020473.

125.    Wichtman further explained that this structure ensured that the "Tribal Council can't get a wild hair up their hiny and pass a resolution or motion to fire [Brian] because they do not have the authority to act in that capacity as Member." *Id*.

## I.     The restructuring documents require maintenance of non-tribal control over key operations, as well as the approval of Martorello to make any significant changes.

126.    Bellicose Capital was sold to the Tribe in exchange for a Secured Promissory Note in the amount of $300,000,000.00 to be paid to Eventide. Ex. 39 at Martorello_000100.

127.    As part of the sale, Martorello and the Tribe agreed to several interrelated transactional documents, including (1) the Delegation of Authority Policy, (2) the Intratribal Servicing Agreement, (3) the Loan and Security Agreement, and (4) the Secured Promissory Note. *See generally* Exs. 40, 41, 42 and 43.

128.    For example, the Tribe contractually relinquished the right to control key aspects of Ascension through the Delegation of Authority Policy. *See generally* Ex. 40.

129.    Under this policy, Brian McFadden—not the Tribe—has the sole authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) execute documents on behalf of Ascension, (3) open and maintain bank accounts, (4) adopt employee benefit plans and programs,

and (5) "authority regarding all matters necessary for the day to day management of Ascension." *Id*. at § 1.4(a)-(e) at LVD-DEF00002882.

130.    By contrast, the only matters designated to the tribal co-managers are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*. at § 1.2(a)-(c) at LVD-DEF00002881.

131.    And, while the authority to appoint the president seems to provide some control, the Loan and Security Agreement takes this power away because to appoint a new president, Hazen and Williams must receive the approval of Eventide (and hence, Martorello). *See* Ex. 42 at Martorello_000080.

132.    The Tribe also contractually relinquished the right to control key aspects of Big Picture through an "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. *Compare* Ex. 41, *with* Ex. 13 at § 4.2.1.

133.    For example, the Intratribal Servicing Agreement indicates that Big Picture has retained Ascension, the "Servicer," for the purpose of providing "business management, consulting and professional services[,]" and establishes that Ascension "shall have the authority and responsibility to manage communication and interaction between [Big Picture] and each vendor, Commercial Finance Provider and other agents of" Big Picture. Ex. 41 at LVD-DEF00002338-2339.

134.    Among other things, the Intratribal Servicing Agreement also: (1) prohibits Big Picture from hiring any vendor unless it is approved by Ascension (*id*. at LVD-DEF00002340); (2) requires Ascension to "insure that gross revenues and other proceeds connected with or arising from the operation of" Big Picture are "deposited daily" into Big Picture's bank accounts (*id*. at LVD-DEF00002342); and (3) requires Ascension to provide an Operating Budget and Servicing Budget for the lending enterprise (*Id*.).

135.     And just like the Delegation of Authority Policy, the Intratribal Servicing Agreement cannot be amended, modified, or terminated without the consent of Eventide. Ex. 42 at Martorello_000080 ("Servicing Agreement. Neither Borrower nor any Subsidiary shall amend, modify, or terminate the Servicing Agreement. . . .").

136.     The Loan and Security Agreement also contains a significant number of controls and restrictions over the lending business, such as a requirement that Big Picture maintain "a minimum portfolio size of fifteen million dollars ($15,000,000) to a maximum portfolio size in any given month equal to 1.1 times the previous month's portfolio size." *Id*. at Martorello_000075.

**J.     Martorello Continues to Receive the Net Profits of the Lending Scheme and Directly Approves of Certain Matters Related to the Lending Business.**

137.     The Secured Promissory Note establishes a repayment schedule based on the profitability of the lending enterprise, requiring the Tribe to make monthly payments "equal to the amount of Net Cash Available." Ex. 43 at Martorello_000129.

138.     The Net Cash Available is calculated as "[g]ross [r]evenues deposited" into Big Picture Loans' accounts, minus the following: (1) a monthly distribution to the Tribe of 2% of the Gross Revenues; (2) a monthly reinvestment amount of 2% of the Gross Revenues (to be used to increase the portfolio); and (3) ordinary expenses. *Id*. at Martorello_000129-130.

139.     Martorello—through his companies and trust—has received substantial distributions from Big Picture and Ascension's operations. For example, Martorello produced a spreadsheet entitled "Eventide Distribution Calc.," which tracks the inbound and outbound distributions to Eventide and its shareholders between March 2016 and April 2017. Ex. 44.

140.    Between March 2016 and April 2017, Eventide received $19,472,174 and distributed $20,119,000, including a distribution of $5,130,345.00 to Martorello's wholly owned subsidiary, Gallant Capital, and $11,990,924.00 to Breakwater Holdings, LLC. *Id.*[5]

141.    Sworn financials submitted in connection with Eventide's bankruptcy confirm the distributions between February 2018 and August 2019. Ex. 46 (excerpt from statement of financial affairs of Eventide regarding its payment to insiders). During this time, Eventide distributed: (1) $9,597,883 to Breakwater Holdings; and (2) $4,031,550 to Gallant Capital. *Id.*

142.    Documents produced by Martorello also confirm that he approved operational changes to the lending business. For example, in June 2016, Martorello provided written consent for "Ascension Technologies, LLC's expansion and establishment of an office in Atlanta, Georgia." Ex. 47 at LVD-DEF00003643.

143.    Martorello also approved requests for outside third parties to "reinvest in the business of BPL[.]" Ex. 48 at Martorello_000020; *see also* Ex. 49 at Martorello_00021 (consenting to a $720,593.16 reinvestment by an outside noteholder); *see also* Ex. 50 at Martorello_00022 (consenting to a $750,000 reinvestment by an outside noteholder); *see also* Ex. 51 at Martorello_00023 (consenting to a $900,000 reinvestment by an outside noteholder).

144.    Also, the hiring of new employees for Ascension requires Martorello's approval, and he has exercised this power. *See* Ex. 52 at LVD-DEF00015613 (consenting to the hiring of a Risk and Analytics Manager, as well as a Vice President of Marketing).

**K.    The Loan Contracts Misrepresent the Nature of Lender, Applicable Law, and Deprive Consumers of All Remedies.**

145.    In Virginia, subject to several exceptions not applicable here, "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code §

---

[5] Breakwater Holdings is a wholly owned subsidiary of Martorello's trust. Ex. 45.

6.2-303(A).

146.    Virginia's Code further provides that its usury laws "shall apply to any person who seeks to evade its application by any device, subterfuge, or pretense whatsoever," including but not limited to the "pretended negotiation, arrangement, or procurement of a loan through any use or activity of a third person, whether real or fictitious." Va. Code. § 6.2-303(E).

147.    As detailed above, Martorello's subterfuge scheme used the tribe and its entities for the dual purpose of misrepresenting the applicable state and federal laws and concealing the role of Martorello's companies.

148.    To facilitate these efforts, the standard loan contracts misrepresented the role of the tribal entities and misrepresented that borrowers had no rights or remedies against members of the enterprise.

149.    In particular, the standard loan contracts falsely and dubiously claimed that consumers were transacting business with "Red Rock Tribal Lending, LLC d/b/a/ CastlePayday.com, an economic development arm and instrumentality of, and limited liability company wholly owned and operated by, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized American Indian Tribe[.]"

150.    On another occasion, the contract again misrepresented that Red Rock Tribal Lending, LLC was "wholly owned and operated by" the LVD, and it was "created for the benefit of the Tribe."

151.    In the signatory section, the contract also stated: "Lender: Red Rock Tribal Lending, LLC d/b/a CastlePayday.com."

152.    In reality, as summarized by the Fourth Circuit, "a 2011 email from Flint Richardson to Martorello stated that the Tribal co-managers were not going to be involved in Red Rock's lending business because Bellicose," Martorello's wholly owned company, "would

completely operate it." *Williams v. Martorello*, 59 F.4th 68, 87–88 (4th Cir. 2023) (citation omitted). And, as detailed by the district court: (1) "there is substantial (and largely unrebutted) evidence that, throughout the relevant class periods, Martorello had de facto control of Red Rock and Big Picture's lending operations," (2) that "Martorello was both highly instrumental and heavily involved in the LVD's entrance into the business of payday lending," (3) that "Martorello was functionally in charge of the lending business and the Tribal 'managers' were 'rather meaningless,'" (4) "[a]nd, even after the LVD restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show." *Williams*, 339 F.R.D. at 52–53.

153.    As part of Martorello's fraudulent lending scheme, the enterprise also used loan contracts that fraudulently misrepresented the law that applied to the loans.

154.    For example, the contracts stated: "This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal Law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for your convenience."

155.    Although this governing law provision appears to allow for the application of federal law, the loan contract subsequently takes this away, requiring a borrower to agree that the loan "is subject solely and **exclusively to the Tribal law** and jurisdiction" of the LVD.

156.    What's more, the contract's summary of the "Tribal Dispute Resolution Procedure" specifies that a borrower's complaint "shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and **does not create any binding procedural or substantive rights for the petitioner**."

157.    As Judge Payne found the loan provisions in the contract "operate to functionally waive a consumer's right to vindicate federally protected statutory rights," and "the animating purpose of these provisions is to allow for the making of consumer loans free from the strictures of federal law." *Williams*, 2021 WL 2930976 at *7.

158.    After Martorello appealed this ruling, the Fourth Circuit affirmed Judge Payne's decision and found that loan contracts and tribal law "provisions incorporated into the Loan Agreement make clear that the waiver does not permit the Borrowers to effectively vindicate their federal rights." *Williams*, 59 F.4th at 81.

159.    The loan contracts also falsely and deceptively claimed that tribal law (not Virginia's usury laws) applied to the loans.

160.    The tribal choice-of-law provision, however, is unenforceable under Virginia law as explained by the Fourth Circuit in *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021).

161.    In that case, the Fourth Circuit "certified for interlocutory review the question of whether enforcement of the governing-law clause would violate Virginia's compelling public policy." *Hengle*, 19 F.4th at 349.

162.    In answering this question, the Fourth Circuit concluded "that the Supreme Court of Virginia would not enforce the [tribal] governing-law clause because it violates Virginia's compelling public policy against unregulated usurious lending." *Id*. at 352.

163.    While acknowledging "that contractual choice-of-law clauses should be enforced absent unusual circumstances," the Fourth Circuit found that "the circumstances here— unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to Virginia borrowers—***unquestionably*** 'shocks… one's sense of right' in view of Virginia law." *Id*. (emphasis added) (citation omitted).

164.    In reaching this conclusion, the Fourth Circuit explained that "[s]ince as early as

1734, the Virginia legislature has regulated usurious loans based upon 'considerations of public policy.'" *Id.* at 352 (citation omitted).

165.    After citing several cases acknowledging these considerations, the court further added that: "Virginia's legislature has signaled the importance it attaches to the usury laws by enacting an anti-waiver provision, which states that '[a]ny agreement or contract in which the borrower waives the benefits of [Virginia's usury laws] or releases any rights he may have acquired under [those laws] shall be deemed to be against public policy and void.'" *Id.*

166.    Such a provision, the court explained, is "evidence that a state usury statute represents a fundamental policy of the State that overcomes a contractual choice-of-law clause." *Id.*

## CONSUMERS PAID THE LOANS UNDER FALSE PRETENSES

167.    As reflected by the parties' Joint Stipulation Regarding Calculation and Tabulation of Loan Data (Williams, Dkt. 1249), loan-level data was produced to the parties' counsel.

168.    This data showed, for example, Plaintiff Lula Williams had 2 loans for which she borrowed $1,200.00 and paid back $1,930.00. The range of APRs was from 793.478% to 1303.57%. Dkt. 1249 at ¶ 2.

169.    The data further showed that Plaintiff George Hengle had 10 loans for which he borrowed $8,200 and paid back $16,073.75. The range of APRs was from 325.893% to 1596.88%. Dkt. 1249 at ¶ 4.

170.    For Plaintiff Coffy, the loan records showed that he had 2 loans for which he borrowed $1,800 and paid back $3,200.00. The range of APRs was from 506.944% to 851.667%. Dkt. 1249 at ¶ 5.

171.    For Plaintiff Gillison, Jr., the loan records showed that he had 2 loans for which he borrowed $1200 and paid back $2862.50. The range of APRs was from 536.765% to 570.312%.

172.    As reflected by their payments, Plaintiffs clearly and actually relied on the subterfuge scheme, including its misrepresentations about the nature of the lender and legality of the loans.

173.    Plaintiffs were also justified in their reliance as the contracts created the appearance that they were doing business with a sovereign government; one which would not misrepresent the nature of the transaction or applicable law.

174.    Just like the plaintiffs, the class certified (who took out loans as a result of the same subterfuge scheme) also suffered damages in the amount of $43,401,817.17. *See* Sept. 22, 2023 Final Judgment Order (attached as Exhibit 53).

**JUDGE PAYNE AND THE FOURTH CIRCUIT'S
FINDINGS AND CONCLUSIONS CANNOT BE RELITIGATED**

**A.    The Misrepresentation Opinion**

175.    The doctrine of collateral estoppel applies in dischargeablity proceedings to preclude further litigation. *Grogan v. Garner*, 498 U.S. 279, 285 n. 11 (1991).

176.    In the Fifth Circuit, "the test for applying the doctrine of collateral estoppel requires that (i) the issue to be precluded must be identical to that involved in the prior action, (ii) in the prior action the issue must have been actually litigated, and (iii) the determination made of the issue in the prior actions must have been necessary to the resulting judgment." *In re Nix*, 92 B.R. 164, 167 (Bankr. N.D. Tex. 1988). Here, each of these elements are satisfied.

177.    To begin, the parties extensively litigated the Plaintiffs' claims, including Martorello's involvement in the fraudulent lending scheme.

178.    Most notably, after Martorello contested his involvement and filed a blatantly false declaration regarding the same, Judge Payne held a two-day evidentiary hearing primarily focused on Martorello's involvement in the scheme to defraud consumers through the creation and collection of the illegal loans.

179.    Following the briefing and two-day hearing (as well as post-hearing briefing), Judge Payne issued a Memorandum Opinion on November 18, 2020, which was subsequently affirmed by the Fourth Circuit as part of its review of Judge Payne's class certification decision. *Williams*, 2020 WL 6784352 at *2, *aff'd*, 59 F.4th 68 (4th Cir. 2023).

180.    As Judge Payne explained, a previous model known as "rent-a-bank" existed where "payday lenders funded, serviced, and collected loans that were nominally made by the national banks which received a small payment in return for fronting the loans." *Williams*, 2020 WL 6784352 at *2.

181.    The "payday lenders had to abandon Rent A Bank schemes when federal regulators intervened and put a stop to them," prompting "payday lenders" to segue "into the so-called "Rent A Tribe" scheme." *Id*.

182.    "This new device to evade state usury laws used Native American tribal entities (rather than banks) as the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in doing so to preclude enforcement of the interest rate caps in state usury laws." *Id*. (citing Nathalie Martin & Joshua Swartz, THE ALLIANCE BETWEEN PAYDAY LENDERS AND TRIBES: ARE BOTH TRIBAL SOVEREIGNTY AND CONSUMER PROTECTION AT RISK?, 69 Wash. & Lee L. Rev. 751, 785 (2012)).

183.    Originally, "Martorello became involved in payday lending using a company called MMP Finance and an internet domain" of www.peppercash.com. *Id*. The "interest rates on these loans" were "usurious under state laws" and claimed "to be governed by the laws of Costa Rica." *Id*. However, "in 2011, Martorello became interest in the tribal lending concept," which, in turn, led him to the LVD. *Id*.

184.    Contrary to his under oath testimony, Judge Payne found that the evidence showed that "Martorello was heavily involved in the creation of Red Rock," including that "Martorello's

legal counsel prepared the documents for the formation of Red Rock, and Martorello reviewed those documents for substantive comment." *Id*. at 3 (citations omitted).

185.    Judge Payne further found that the record was "clear that Martorello actually selected the name 'Red Rock.'" *Id*. at 4 (citations omitted).

186.    In addition to selecting the name, Judge Payne further found that "Martorello was involved in the formation of Red Rock in an even more fundamental sense," including that Martorello "sought out a connection with the LVD so that he could get into the Tribal lending business." *Id*. at 4.

187.    Beyond initiating the scheme, Judge Payne further found that the evidence shows "at the time of the initial formation of Red Rock, Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely and that the 'Tribe's managers are not involved in the business.'" *Id*. at 5 (citation omitted).

188.    By way of one example, Judge Payne explained that the "rather meaningless role played by the Tribe's co-managers is manifest in an email exchange between Martorello and the Tribe's lawyers, wherein Martorello refused to respond substantively when the Tribe asked him to identify what the co-managers were being asked to approve." *Id*. at 5.

189.    Judge Payne further found that the "[e]vidence at the July 21 hearing also established the very limited involvement of the Red Rock employees in the lending operation." *Id*. at 6.

190.    Among other things, the employees had no involvement in "the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees." *Id*.

191.    As summarized by the Vice Chairwoman of LVD, Joette Pete: "after the inception of the business, it was <u>operated completely by Martorello</u> until Government regulators and

litigation against competitors began. As these cases proceeded, efforts were made to <u>create the appearance of the Tribe's involvement</u> but the Tribe had no substantive involvement." *Id.* (emphasis in original).

192.    "Collection of the consumer loans was [another] key component of the lending operation," and, as determined by Judge Payne, "[a]t the evidentiary hearing it was established that money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access." *Id.*

193.    Martorello's control over all facets of the lending scheme was further confirmed by the testimony of the Tribe's Vice Chairman woman, who explained: "<u>For Martorello to be able to claim that LVD law applied to the consumer loans</u>, the deal required that Red Rock 'originate' the loans. But this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria <u>because Martorello ran the business and bore all the risk</u>. After the inception of the business, <u>it was operated completely by Martorello</u> until government regulators and litigation against competitors began. As these cases proceeded, <u>efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement</u>." *Id.* at 5 (citation omitted) (emphasis in original).

194.    The Vice Chairman's testimony was further corroborated by an email for several years later, where "Martorello confirmed that to be the case, saying that, "[a]s far as I know, <u>the Managers' [sic] don't really do anything</u>." *Id.* at 7 (citation omitted) (emphasis in original).

195.    Other evidence, as determined by Judge Payne, further established that Martorello withheld "access to th[e] formulas that established the underwriting criteria," and, thus, "there would be no way for Red Rock's managers meaningfully to participate in the lending process." *Id.* at 7.

196.    Judge Payne further concluded "that Red Rock was 'rebranded' to become Big

Picture," and "except for a few cosmetic changes (or 'optics' as Martorello described them), the LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." *Id*. at 8.

197.    As for the sale, Judge Payne found that "those changes were all part of Martorello's desire to evade liability by trying to use LVD's sovereign immunity." *Id*. at 9.

198.    Judge Payne further found that "two weeks after the district court" decided an important tribal lending case in Otoe-Missouria, "Martorello sent an email to Rosette proposing a restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement." *Id*.

199.    Judge Payne also considered other emails authored by Martorello, such as the one where described "that the result of affirmance of the New York ruling would be 'certain death.'" *Id*. at 9 (citation omitted).

200.    After review of dozens of exhibits and testimony, Judge Payne found that "Martorello was motivated to sell Bellicose to LVD because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement between him, his entities, and LVD." *Id*. at 11.

201.    Judge Payne also found that Martorello and others lied about the creation of Big Picture, and that the evidence showed that "Martorello created the entity, Big Picture Loans, at least a year before LVD says that it created or formed the entity." *Id*. at 12.

202.    After reviewing many of Martorello's other emails (including some of those cited above), Judge Payne found that the record showed "convincingly that Big Picture was not created by LVD as the result of the Tribe's years of knowledge and business acumen related to online lending. In fact, Big Picture was created by Martorello for use with a different tribe and, when that fell through, Big Picture, at Martorello's instruction, was used to rebrand Red Rock. In other words,

the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the creation of Red Rock." *Id.*

203.    At the conclusion of this Memorandum Opinion, Judge Payne explained that "in analyzing all pending and future motions," the court would "be required to take into account the record about the misrepresentations and findings about them." *Id.* at 14.

**B.    The Class Certification Opinion**

204.    On July 20, 2021, Judge Payne issued a Memorandum Opinion explaining the basis for the granting of Plaintiffs' motion for class certification. This opinion incorporated Judge Payne's previous findings. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. at 52 ("The facts surrounding this lawsuit have been recounted by the Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. The facts of this case are, therefore, presumed known, and it suffices here to provide only a brief summary.").

205.    In the Memorandum Opinion on class certification, Judge Payne rejected Martorello's argument that "that, because his role in the lending scheme changed between 2013 and 2019, the class members will be situated differently vis-a-vis each other across different time periods, and those differences between class members will result in a need for a series of complicated mini-trials to determine which class members can recover." *Id.* at 54.

206.    Judge Payne rejected this argument because, as detailed in his earlier findings, Judge Payne summarized that:(1) "there is substantial (and largely unrebutted) evidence that, throughout the relevant class periods, Martorello had de facto control of Red Rock and Big Picture's lending operations," (2) that "Martorello was both highly instrumental and heavily involved in the LVD's entrance into the business of payday lending," (3) that "Martorello was functionally in charge of the lending business and the Tribal 'managers' were 'rather meaningless,'" (4) "[a]nd, even after the LVD restructured the lending operations to avoid

regulatory scrutiny, the evidence strongly shows that Martorello was still running the show." *Williams*, 339 F.R.D. at 52–53.

207. Martorello requested permission to appeal both the misrepresentation opinion and class certification opinion. *See, e.g., Williams v. Martorello*, 59 F.4th 68, 76 (4th Cir. 2023) ("Martorello petitioned for permission to appeal, which we granted. We have jurisdiction over the grant of class certification pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). We have pendent jurisdiction over the Misrepresentation Opinion because it is 'so interconnected' with the class-certification opinion that it 'warrant[s] concurrent review.'").

208. On January 24, 2023, the Fourth Circuit affirmed both of these decisions and found that Judge Payne did not err in concluding that "Martorello operated as the "de facto head" of the Tribe's lending operations during the class period[.]" *Williams*, 59 F.4th at 87.

209. The Fourth Circuit further held that "[t]he record supports the district court's conclusion that Martorello lied when he said he was never involved in receiving or demanding payments on Red Rock loans." *Id*. at 89.

210. Put differently, the Fourth Circuit found "the district court's credibility determination and the substantive findings that flow from it—namely, that Martorello received consumer payments on Red Rock loans such that he was functionally in charge of Red Rock's lending operations—are supported by the record." *Id*.

211. The Fourth Circuit not only affirmed Judge Payne's findings regarding Red Rock, but it also found that "that Martorello was still largely in charge of the lending operations after the restructuring and that he effectively controlled the tribal lending entities." *Id*. at 90.

## C.    The Summary Judgment Opinion

212. After the Fourth Circuit affirmed, the parties moved for summary judgment.

213. On September 22, 2023, Judge Payne granted Plaintiffs' motion for summary judgment and held: (1) Plaintiffs were entitled to summary judgment on the choice-of-law issue;

and (2) that mistake of law was unavailable to Martorello. *Williams v. Big Picture Loans, LLC*,
693 F. Supp. 3d 610, 643 (E.D. Va. 2023).

214.    In addition to these two issues, Plaintiffs moved for summary judgment on the
elements of their claims under §§ 1962(c)-(d) of their RICO claims. *See generally id*.

215.    As to the § 1962(d) claim, "Martorello conceded that, after the Court's ruling that
the loans are governed by the law of Virginia and that a mistake of law defense is not available as
a defense to liability, 'there are no remaining triable issues of fact on Plaintiffs' § 1962(d) claim'"
because the undisputed evidence show that Martorello knew about and facilitated the unlawful
lending scheme. *Id*. at 621 (docket citations omitted).

216.    As to the § 1962(c) claim, Martorello further stipulated: "that, for the entire class
period, he was associated with an association-in-fact enterprise the activities of which affect,
interstate or foreign commerce, and Mr. Martorello participated in the operation of the affairs of
the enterprise through the collection of "'unlawful debt.'" *Id*. (docket citations omitted).

217.    Based on the loan-level data, the parties also stipulated that the total damages were
$43,401,817.47. *Id*. (docket citations omitted).

218.    Following six years of litigation and after cross-motions for summary judgment, a
Final Judgment Order was entered against Martorello in September 2023 in the amount of
$43,401,817.17 in favor of the Plaintiffs and other borrowers in Virginia who took out loans from
the illegal lending enterprise. *See* Sept. 22, 2023 Final Judgment Order (attached as Exhibit 53).

219.    After Plaintiffs started to attempt to collect the judgment, including seeking
repatriation of assets that Martorello transferred to foreign trusts, Martorello filed this bankruptcy
to block Judge Payne's consideration of his fraudulent transfers.

## CAUSES OF ACTION

### Count 1: Request for Exception of Plaintiffs' Claims from Discharge
### Under 11 U.S.C.A. § 523(a)(2)(A)

220.    The Plaintiffs' claims evidenced by the Final Judgment Order are non-dischargeable under § 523(a)(2)(A). For the reasons explained above (which are expressly incorporated herein), the judgment amount is nondischargeable under 11 U.S.C.A. § 523(a)(2) because the *Williams* litigation and subsequent judgement have established that Martorello was the "mastermind" behind a criminal lending scheme that obtained money from consumers under false pretenses and false representations. The criminal lending scheme not only designed to deceive consumers about the true lender of the loans (and conceal the role of Martorello and his companies), but also to deceive consumers about the applicability of state and federal law through a series of misrepresentations about the waiver of laws in the loan contracts. Accordingly, Plaintiffs request entry of a judgment excepting the claims evidenced in the Final Judgment Order from discharge under 11 U.S.C.A. § 523(a)(2)(A).

### Count 2: Request for Exception of Claims from Discharge
### Under 11 U.S.C.A. § 523(a)(6)

221.    For the reasons explained above (which are expressly incorporated herein), the claims evidenced by the Final Judgment Order are non-dischargeable under § 523(a)(6) because the *Williams* litigation and subsequent judgement have established that Martorello was the "mastermind" behind a criminal lending scheme that willfully and maliciously injured consumers through the creation and collection of triple interest loans that blatantly violate state lending laws (as well as criminal laws). Accordingly, Plaintiffs request entry of a judgment excepting the claims evidenced by the Final Judgment Order from discharge under 11 U.S.C.A. § 523(a)(6).

### Count 3:  Request for Declaratory Judgment Under 28 U.S.C. § 2201
### That Plaintiffs' Claims are Non-Dischargeable

222.    There exists and actual controversy regarding whether the Plaintiffs' claims against Martorello, including the claims evidenced by the Final Judgment Order, are dischargeable.  For the reasons explained above (which are expressly incorporated herein), the Plaintiffs' claims

against Martorello are non-dischargeable under both §§ 523(a)(2)(A) and 523(a)(6).  The Plaintiffs therefore request entry of judgment under 28 U.S.C. § 2201 declaring that the Plaintiffs' claims, including the claims evidenced by the Final Judgment Order, are non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

## <u>CONCLUSION AND PRAYER</u>

223.    WHEREFORE, Plaintiffs request entry of judgment from the Court finding that the Plaintiffs' claims, including the claims evidenced by the Final Judgment Order, are nondischargeable under 11 U.S.C.A. §§ 523(a)(2) and § 523(a)(6).

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.
State Bar. No. 14866000
John D. Gaither
State Bar No. 24055516
NELIGAN LLP
4851 LBJ Freeway, Suite 700
Dallas, Texas 75244
Telephone: 214-840-5300
pneligan@neliganlaw.com
jgaither@neliganlaw.com

*/s/ Andrew J. Guzzo*
Kristi C. Kelly, *pro hac vice* forthcoming
Andrew J. Guzzo, *pro hac vice* forthcoming
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 - Telephone
(703) 591-0167 - Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Counsel for the Virginia Borrowers*